JOHN W. EWING v. DANIEL B. AINGER AND CHARLES E. BAXTER.

*Libel and slander—Ambiguous article—Question for jury—Member of board of supervisors—Compensation—Services on committee.*

1. Where the language of an alleged libelous article is ambiguous, and capable of being understood in an innocent and harmless, as well as in an injurious, sense, its true interpretation is for the jury; citing *Lewis v. Chapman*, 16 N. Y. 371; *Edwards v. Chandler*, 14 Mich. 471.

2. How. Stat. § 502, which provides that each member of the board of supervisors of a county shall be allowed $3 per day for his services and expenses in attending the meetings of the board, and mileage as therein stated, and that said sum shall be in full for all services rendered and expenses incurred in attending the meetings of the board, and while acting upon any committee of the board during its session, and which makes it a misdemeanor to receive further or other compensation, fixes the maximum amount that the members can receive for services rendered the county, and the board has no power to extend it beyond the statutory limit.

3. It is unlawful for a supervisor to receive pay, as a member of a committee appointed by the board of supervisors, for services performed when the board is not in session.

Error to Eaton. (Hooker, J.) Argued June 23, 1893. Decided July 26, 1893.

Case for libel. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*James M. Powers,* for appellant.

*Huggett & Smith,* for defendants.

LONG, J. Defendants are the owners and publishers of the Charlotte Republican, a newspaper printed and published at Charlotte. This action is brought to recover damages for libel in the publication of two articles by the defendants in their paper. One was published July 24, 1891, and the other August 20 of the same year, and relate to the action of the plaintiff while a member of the board of supervisors of Eaton county. The first article, as set out in the declaration, is substantially as follows:

"ANOTHER CHAPTER ON JOHN EWING.

"*Editors Republican:*

"Some portions of the records and doings of the board of supervisors may be of interest to the tax-payers of the county.

"October session of 1884, several petitions were presented to the board to abolish the office of county drain commissioner. A committee of three was appointed to investigate and report. A majority reported as follows:

" ' Would respectfully report that, in our opinion, such a course at this time would be inexpedient, and prejudicial to the best interests of the county.'

"Mr. Ewing moved that the majority report be adopted. Motion prevailed. Moved to proceed to the election of drain commissioner, the same man being elected by 11 votes.

"January 5, 1885, a committee of three appointed on drainage. Moved that all matters relating to drains and drainage, brought up at this session of the board, be referred to the committee, when appointed. Amended by adding the words—

" ' And that the said committee be authorized to receive statements from persons in regard to reports in circulation respecting the action of the present drain commissioner in his duties as such commissioner.'

"Amendment prevailed, and original, as amended, carried; Mr. Ewing being appointed on the committee. January 8, moved that the board deem it inexpedient for the committee to visit the Milbourn extension drain. Motion prevailed. January 15, committee made a report, which is on file in the clerk's office, a part of which is as follows:

" ' That there be a committee appointed from this board, whose duties it shall be to hear grievances from any parties, arising from any irregularities of said commissioner; and, if said charges seem to warrant the action of the board of supervisors before their next regular session, then it shall be the duty of said committee to have the board called together, that they may take action on said charges. And we do recommend, as we have not a satisfactory report from said commissioner, that he be requested to make, on or before the 18th of February next, to said committee, an itemized statement,' etc.

"—Which was done by said commissioner, and is now on file in the clerk's office. Not one word authorizing Reformer Ewing to spend so many days at $3 per day, and travel so many miles at 10 cents per mile.

"A claim for damages having been presented for certain acts of the drain commissioner, on October 18, 1885, Mr. Ewing, for the committee, submitted the following report:

" ' Would report that we have carefully considered the same, and we do not believe the county is in any way responsible, and would refer you to Michigan Reports, vol. 49, page 479, which says: "A township is not responsible for the defaults and misconduct of its drain commissioner in the performance of his statutory duties." Your committee would report the said claim back to this body, with the recommendation that the same be disallowed.'

"Motion prevailed. Then he brings claim for $61.80, as stated last week by your correspondent. O consistency, thou art a jewel!

"He figures very liberally on his own claims, but reports a claim of Dr. E., and moves that it be allowed at $5—one-half the amount claimed. He also reports the claim of Dr. A., of $45, and moves

that it be allowed at $20. All this without regard to the value of the services performed. Many more such instances could be cited, but these are sufficient to convey an idea of his methods on the board. Oh, yes, he loves the tax-payer, as the following items will show: The total amount received by him from the tax-payers of Eaton county in the last eight years, so far as found, foots up at $848.62, and this does not include what he has received from his own town as supervisor. We even find that he has drawn from the county treasurer, for his services in caring for the poor of his township since November, 1883, the sum of $92.50, being $11.56 per year. We doubt if the poor families in the county, receiving help, will average as much for the same length of time; the supervisors of Benton, Bellevue, and Vermontville, combined, only drawing $121.74 for their services. We mention these towns, as each has a village. Economy for the tax-payer, you see, is his motto.

"We now present a tabulated statement of the amount drawn by him for services and mileage for the various sessions of the board, and the amounts to which he was lawfully entitled."

The tabulated statement is not set out here, but consists of a statement of the number of miles charged for traveling, and miles which it is claimed he was entitled to; days charged, and days he was entitled to; and the amount of claimed overcharge,—in each year from 1883 to and including the session of the board in 1891; making a total claimed overcharge for *per diem* and mileage of $200.82. Continuing, the article reads:

"Now, to be fair with Mr. Ewing, his attention is called to the above table, and he is invited to select out such items therein as he deems to be wrong, and state to the public wherein they are incorrect; and we ask Mr. Ewing to state, over his own signature, what the distance (by the nearest traveled route) is from his home to Charlotte. To be exact, is it not 13⅝ miles? Also we ask him what the statutory fee allowed members of the board of supervisors per mile is; and, again, to state the statute which allows him fees as supervisor for any work, except during the session of such board. When he does this, we have a long list of others to call his attention to; and, like Banquo's ghost, these inquiries will not down until they are answered, and until this modern reformer has himself reformed. Oh, yes, he loves the tax-payer, and is 'very careful of the people's money,' when he 'gets it.'

"ONE OF THE TAX-PAYERS."

The second article, as set out in the declaration, is as follows:

"We have waited patiently to hear Reformer John deny the charges made in the Charlotte Republican, of taking money from the treasury that did not belong to him, yet we have heard nothing drop. Let her drop, John."

The defendants, under their plea of the general issue, gave notice, among other matters of defense, that the statements contained in the articles were true. These articles were put in evidence on the trial. It was admitted by plaintiff that he received the several sums of money mentioned in the tabulated statement, but he claims he received them for services on committees at times when the board was not in session, and that at such times, and for such services, he could lawfully take this compensation. It was further insisted that the articles charged him with receiving such moneys at times when the board was in session.

The court below directed the jury that the first article charged the plaintiff with having taken this $200.82 unlawfully, and that it was libelous *per se*, and could be defended only by showing its truth. He also directed the jury that there was a controversy between counsel as to its meaning.

Counsel for plaintiff, it seems, contended in the court below, and he now contends here, that the article charged plaintiff with having received the money for mileage in attending sessions, and for services during such actual attendance for a greater number of days than the statute allows, and as extra compensation, which he had no right to take. On the other hand, it was claimed by defendants' counsel in the court below, and is now claimed, that the article simply charged the plaintiff with having received the money for work done when the board was not in session, and that money so received was unlawfully taken; and it was further claimed that this statement was

true. The court below left the question of the meaning of the article for the determination of the jury, saying:

" Does it mean, and does it convey the impression upon its face to the ordinary observer or reader, that the amounts and items charged here are for services and mileage performed in attending the sessions of the board, respectively, merely, or does it convey the impression that the items here include the amounts at other times, such as that mentioned in the proof,—for instance, work done upon committees at times when the board was not in session; mileage to and from one place or another, where it might be supposed to be necessary that such committee should work while the board was not in session? To determine this question, you are to take into consideration the entire article, and determine from that whether it will bear the latter construction. If it will, then, of course, evidence of money received, if unlawfully received, for such attendance upon committees, could be legitimately used to swell the aggregate to $200.82."

Of the second article, the court directed the jury that there could be no doubt of its meaning, and that it plainly charged that the plaintiff took money from the county treasury that did not belong to him; that the publication of the two articles was not denied, and unless the defendants had proved both substantially and wholly true, in the sense they should be read, the verdict should be for the plaintiff.

The court was not in error in leaving the meaning of the first article to the determination of the jury. It was for them to say whether one reading it would be led to believe that it charged, or intended to charge, the plaintiff with having taken this money for services while on the board, and for more days than the statute allows, or whether it was simply intended to charge by the article that he took it for services when the board was not in session. The article is ambiguous, and it became a question of fact, for the jury, to determine its meaning. The language does not necessarily imply that the money was taken while the board was in session. The article asks Mr. Ewing "to state the statute which allows him fees as supervisor for

any work, except during the session of such board." There
is no doubt that where the language of an alleged libel is
ambiguous, and capable of being understood in an innocent
and harmless, as well as an injurious, sense, its true inter-
pretation is for the jury. *Lewis v. Chapman,* 16 N. Y.
371; *Edwards v. Chandler,* 14 Mich. 471.

It was a very material question, on the trial of this case,
what interpretation the court or jury might give the arti-
cle. If it applied to moneys unlawfully received while the
board was in session, there was grave doubt whether there
was sufficient proof of its truth; while, on the other hand,
it was admitted that plaintiff received the money for doing
committee work when the board was not in session, and it
was claimed by plaintiff, as matter of law, that he had a
right to receive it. This claim raises the other important
question in the case. The court below directed the jury
that the board of supervisors had no authority to appoint
such committees, and pay for services performed outside
the session of the board, and that receiving money under
such circumstances was unlawful.

How. Stat. § 502, provides:

"Each member of such board of supervisors shall be
allowed a compensation of three dollars per day for his
services and expenses in attending the meetings of said
board, and six cents a mile for each mile necessarily
traveled in going to and returning from the place of such
meeting, to be audited by the board and paid by the
county; which compensation of three dollars per day shall
extend to and be allowed for the first twelve days only of
any continuous regular session, and six days only for an
adjourned session of said board, and for the first three
days only of any special session of said board, of which
special session there shall be no more than two in any one
official year; which said amount shall be in full for all
services rendered and expenses in attending the meetings
of such board of supervisors, and for all services and
expenses incurred while acting upon any committee of said

96 MICH.—38.

board of supervisors during the session of said board; and any supervisor receiving further or other compensation for such services shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one hundred · dollars nor more than five hundred dollars."

It is contended by counsel for plaintiff that the statute prohibits committees appointed by the board from receiving compensation only during the session of the board, and that any services rendered by a member while on a committee may be charged for and paid, if such services are rendered while the board is not in session.

It is evident from the reading of the statute that the Legislature intended to fix and establish the maximum amount that the members of the board of supervisors could receive for services rendered to the county, and not to leave it to the board to extend it beyond the limit fixed by this statute.

In *Kennedy v. Gies*, 25 Mich. 83, the statute of 1871, relative to the compensation of the board of auditors of Wayne county, came before this Court. That statute, after fixing the salary of the auditors, recited, "which sum shall be in full for all services and expenses and traveling fees in attending upon the duties of the office," and made it a misdemeanor for any auditor to receive further or other compensation. It was held that the statute was not void under article 10, § 10, of the Constitution. It was said in that case:

"It is true that statutes and constitutions have sometimes given express power to certain township, or county, or city officers, or boards, to audit and allow their own claims for services, though this, when given, has generally been from some supposed necessity, or when it could be of little moment, and subject to some restriction as to amount, or to review by some other tribunal. And it may, we think, be laid down as the sound and only safe rule

that such a power can only be given by express words or necessary implication, and should never be recognized when the language used, when interpreted by the light of the past legislative and judicial history of the State, will permit a reasonable and probable inference of a contrary intent."

If the statute were to be given the construction contended for by the plaintiff, it would be rendered wholly nugatory. Any member of a committee could be appointed by the board to act outside of, and beyond the session of, the board, and the absolute power would rest with the board to allow such member for any number of days and number of miles traveled, in its discretion. There would be no tribunal to review the action of the board, and it would leave the board judges of their claims, without any power of review. Clearly, it was not the intent of the Legislature to do this, but to fix the maximum amount which the members of the board might receive. The court below was correct in the construction of this statute.

Some other questions are raised. We have examined them, but do not deem it necessary to discuss them. The case was presented to the jury under a very full and fair charge, and the jury found in favor of the defendants.

Judgment affirmed.

McGRATH, GRANT, and MONTGOMERY, JJ., concurred. HOOKER, C. J., did not sit.